J^McCLENDON, J.
This workers’ compensation action is before us on appeal from a judgment in favor of the claimant, Barbara Handy, and against her employer, TEMBEC. For the following reasons, we affirm.
*403 FACTS AND PROCEDURAL HISTORY
On May 12, 2000, Ms. Handy was involved in a serious work-related accident, while in the course and scope of her employment as a stack helper with TEM-BEC, a paper plant located in St. Fran-cisville, Louisiana. At the time of the accident, Ms. Handy had been employed at TEMBEC, or its predecessors, for approximately twenty-one years. The May 12, 2000 injuries occurred when Ms. Handy was crushed between a buggy carrying a roll of paper and a roll of paper on the plant floor. Ms. Handy was transported to Our Lady of the Lake Hospital where she remained for five days. Ms. Handy’s injuries included a right clavicle fracture, multiple rib fractures, and fractured pelvis.
Compensation benefits, including medical and indemnity benefits, were paid through July 1, 2001. Ms. Handy filed a disputed claim for compensation on May 15, 2002. Following a trial of the matter, the workers’ compensation judge (WCJ) concluded that the modified job offered to Ms. Handy was not a legitimate job offer. While recognizing the efforts of TEMBEC in vocational rehabilitation efforts for Ms. Handy, the WCJ ultimately concluded that TEMBEC failed to satisfy its burden of proof. Accordingly, The WCJ concluded that Ms. Handy was entitled to supplemental earnings benefits (SEBs) at the temporary total disability rate, from July 1, 2001 and continuing until such time that vocational rehabilitation efforts return her to employment that would allow for a reduction. The WCJ additionally awarded Ms. Handy $7,000.00 in attorney’s fees. Judgment was signed on October 2, 2003.
From this judgment, TEMBEC has taken a suspensive appeal, assigning the following as error:
1. The WCJ erred in finding that TEMBEC failed to meet its burden of proving available work within the restrictions of Ms. Handy’s ^treating physician despite the fact that TEMBEC tendered a modified position to Ms. Handy approved by the treating physician;
2. The WCJ erred in making unreasonable inferences of fact, and substituting her own opinion in place of the treating physician, in finding that the modified job offer tendered to Ms. Handy and approved by her treating physician were outside the restrictions imposed by the treating physician;
3. The WCJ erred in finding that it was inappropriate for TEMBEC to tender a temporary two-week job assignment to Ms. Handy to perform while the permanent modifications required by the treating physician were to be installed at the plant; and
4. The WCJ erred in making an arbitrary and capricious finding on the part of TEMBEC and awarding attorney’s fees in light of the fact that TEMBEC relied on the opinions of the treating physician, treating occupational therapist, occupational health care nurse and vocational rehabilitation counselor when offering modified employment to Ms. Handy and terminated benefits after Ms. Handy refused to attempt to work and resigned.
STANDARD OF REVIEW
Factual findings in a workers’ compensation case are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Indus. Roofing & Sheet Metal Works, Inc., 96-2840, p. 7 (La.7/1/97), 696 So.2d 551, 556. As an appellate court, we cannot set aside the factual findings of the WCJ unless we determine that there is no reasonable fac *404 tual basis for the findings and the findings are clearly wrong (manifestly erroneous). Stobart v. State, Through Dep’t. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Furthermore, when factual findings are based on the credibility of witnesses, the factfinder’s decision to credit a witness’s testimony must be given “great deference” by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel that its own evaluations and inferences are as reasonable. Scott v. Lakeview Regional Medical Center, 01-0538, pp. 3-4 (La.App. 1 Cir. 3/28/02), 818 So.2d 217, 220, writ denied, 02-1712 (La.10/04/02), 826 So.2d 1127. Accordingly, if there are two permissible views of the evidence, a factfin-der’s choice between them can never be manifestly erroneous or clearly wrong. Chaisson v. Cajun Bag & Supply Co., 97-1225, p. 9 (La.3/4/98), 708 So.2d 375, 381.
DISCUSSION
ASSIGNMENTS OF ERROR NUMBERS 1-3 JOB AVAILABILITY
In these assignments of error, TEMBEC essentially asserts that it met its burden of proving available work for Ms. Handy within the restrictions of her treating physician. Therefore, the award of benefits should bé reversed.
An employee is entitled to receive SEBs if he sustains a work-related injury that results in his inability to earn ninety-percent or more of his average pre-injury wages. LSA-R.S. 23:1221(3)(a). Initially, the employee bears the burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. This analysis is necessarily a facts and circumstances one in which the court is to be mindful of the jurisprudential tenet that workers’ compensation is to be liberally construed in favor of coverage. Banks, 96-2840 at pp. 8-9, 696 So.2d at 556; Hebert v. Terrebonne Parish School Bd., 03-1444, pp. 9-10 (La.App. 1 Cir. 5/14/04), 879 So.2d 222, 228-29.
Once the employee’s burden is met, the burden shifts to the employer who, in order to defeat the employee’s claim for SEBs, or to establish the employee’s earning capacity, must prove by a preponderance of the evidence that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer’s community or reasonable geographic region. The employer may discharge its burden of proving job availability by establishing, at a minimum, the following:
(1) the existence of a suitable job within the claimant’s physical capabilities and within claimant’s or the employer’s community or reasonable geographic region;
|fi(2) the amount of wages that an employee with claimant’s experience and training can be expected to earn in that job; and
(3) an actual position available for that particular job at the time that the claimant received notification of the job’s existence.
Banks, 96-2840 at pp. 9-10, 696 So.2d at 557; Hebert, 03-1444 at p. 10, 879 So.2d at 229.
*405 Here, the parties stipulated that on May-12, 2000, Ms. Handy was employed by TEMBEC and that while in the course and scope of her employment sustained an injury. The parties further stipulated that at that time her average weekly wage was $854.59, giving her the maximum indemnity rate of $384.00 per week; that indemnity benefits for temporary total disability were paid to Ms. Handy by TEMBEC from May 12, 2000, through July 1, 2001; and that medical benefits were also paid through July 1, 2001.
Dr. Michael R. Robichaux, Ms. Handy’s treating orthopedist, testified by deposition that he last saw Ms. Handy on April 9, 2001, at which time he was of the opinion that Ms. Handy was not going to be able to return to her previous level of work. He indicated that Ms. Handy was performing at a light level of activity after a work hardening program. Dr. Robichaux permanently restricted Mrs. Handy to occasional lifting of up to ten to twenty pounds and no heavy lifting on a regular basis. Dr. Robichaux further indicated that Ms. Handy was to avoid repetitive overhead activities because of her clavicle nonunion.[1] As a result of her loss of strength in the upper extremity, Dr. Robichaux assigned a 20% impairment of the upper extremity, which correlated to a 12% impairment of the whole person. Additionally, as a result of Ms. Handy’s pain in her shoulder from her nonunion and pain in her sacroiliac region, Dr. Robichaux assigned an additional 5% impairment to the whole person. Dr. Robichaux also believed that Ms. Handy had reached maximum medical improvement and released her from his care. At trial, Dr. Robichaux testified that there was no significant healing or improvement after the April 9, 2001 date.
| fiA functional capacities evaluation (FCE) in January 2001 indicated that Ms. Handy was capable of a low light level work category. Following the FCE, Michelle Wall, TEMBEC’s vocational rehabilitation counselor, arranged a two-month work conditioning program for Ms. Handy. As part of the return to work effort, Ms. Wall developed a written job analysis for Ms. Handy’s job as a stack helper. Ms. Wall went to the job site and met with Ms. Handy’s supervisor, Craig Ourso, to discuss what physical activities were part of her job. Additionally, Ms. Wall examined a co-worker of Ms. Handy at work. A job analysis was prepared and given to Layne Guidroz, the occupational therapist, to devise a work conditioning program. Ms. Handy undertook work conditioning from February 2001 to early April 2001, attending thirty-five sessions, at which time a second FCE was performed. The FCE was performed on April 6, 2001 by Mr. Guidroz and indicated that Ms. Handy was able to perform at the medium level of full employment.
Ms. Handy expressed concern that the written job analysis for her previous position was not completely accurate in that the job was actually harder than set out on paper. Therefore, Mr. Guidroz went to the job site to observe the job duties. Mr. Guidroz felt that she could perform her job duties with the exception of lifting a forty-five pound winch above shoulder level, which needed to be modified. However, Ms. Handy still expressed concerns about the job description.
Thereafter, Ms. Wall scheduled a rehabilitation consultation for May 16, 2001. Present were Dr. Robichaux, Ms. Wall and Mr. Guidroz. Ms. Handy was not present *406 although she was informed of the meeting.[2] At the meeting, after reviewing a video of another employee performing the activities required of Ms. Handy’s job position, Dr. Robichaux stated that Ms. Handy could return to her former position, with the exception of lifting the winch. He further stated that he believed that Ms. Handy was able to work at a medium level job function in light of the most recent FCE. Dr. Robichaux testified in his deposition that based on 17the videotape and the most recent FCE, using the job analysis as provided by Ms. Wall, Ms. Handy’s previous job at TEMBEC was in the light physical demand level with occasional lifting up to ten to twenty pounds and rare force into the medium level. Dr. Robichaux further stated that he thought Ms. Handy could return to that light level position with the restriction regarding the winch.
As a result of the rehabilitation consultation, TEMBEC’s engineers designed a mounting mechanism to minimize the effort to lift the winch, and made plans to return Ms. Handy to work as of July 2, 2001. A letter was sent to Ms. Handy that her employer was taking her back to work with modifications to her old job. The letter further stated that Ms. Handy was to report to work on July 2, 2001, and her weekly benefits would be terminated at that time. Ms. Handy testified that when she got the letter, she called her supervisor, Craig Ourso. Ms. Handy stated that Mr. Ourso told her that the modification had not yet been made. When she asked what she was to do when she returned, Mr. Ourso advised her to “come back, we’ll find something.” Mr. Ourso did not specify a job for her and did not state whether she would be returning to her old job or going to a new job with TEMBEC. On the day she was to return to work, Ms. Handy called TEMBEC and resigned from her employment stating she did not think she could continue to work in her previous department.
Gary Duvall, a safety and health supervisor at TEMBEC, testified that there are no light duty jobs available at the plant.
Ms. Handy testified that the pictures and video of Ms. Handy’s job were not a true, but rather an incomplete picture of her job. She stated that she often had to climb ladder-like stairs, reel and unreel large hoses, breakdown bolts, pull out forty-pound pins, and drag scrap paper. She also stated she had to use her body weight to push the rolls into the cradles. Further, she testified that she worked 12-hour shifts. The videotape was not complete. When asked by the court, Ms. Wall admitted that she was unaware of some of these activities, including the reeling and unreeling of the large hoses and the hauling of scrap paper.
|sThe WCJ concluded that Ms. Handy was not given a legitimate job offer, determining that Dr. Robichaux signed off on a specific job for Ms. Handy and said job was not available for her at the time she was told to go back to work. Ms. Wall thought that the modification had been made. It was not. Additionally, the WCJ found that there were duties of Ms. Handy’s job that Ms. Wall knew nothing about. The WCJ determined that Ms. Handy’s prior job was physically demanding and in no way could it be classified as a light duty job, even if the use of the winch was removed from the job description.
It is undisputed that following the May 12, 2000 accident, Ms. Handy met her initial burden that her injuries resulted in her inability to earn 90% or more of her average pre-injury wages. The burden then shifted to TEMBEC to prove job *407 availability. Based on the evidence presented, we conclude that the WCJ was not manifestly erroneous or clearly wrong in finding that TEMBEC failed to present sufficient competent evidence to carry its burden. The only position offered to Ms. Handy was her prior job as a stack helper, which by everyone’s account was not modified at the time her benefits were terminated. Accordingly, there was no actual position available for that particular job at the time that Ms. Handy received notice of the job’s existence.
Furthermore, even if the offered position had been available, the testimony is clear that no light duty jobs were available at TEMBEC’s plant. Dr. Robiehaux originally testified that Ms. Handy was only capable of a light physical demand level job. He later modified his opinion at the rehabilitative conference to state that Ms. Handy was able to return to work at a medium level job function. However, the WCJ found that the information provided by Ms. Wall to Dr. Robiehaux, upon which his modified opinion was based, was not totally accurate. We cannot say the WCJ was clearly wrong and find no manifest error.
ASSIGNMENT OF ERROR NUMBER 4 ATTORNEY’S FEES
The WCJ determined that TEM-BEC was arbitrary and capricious in terminating benefits to Ms. Handy and awarded her attorney’s fees in the | samount of $7,000.[3] The WCJ’s determination of whether an employer or insurer should be cast with attorney’s fees in a workers’ compensation action is essentially a question of fact subject to the manifest error or clearly wrong standard of review. Frith v. Riverwood, Inc., 04-1086, p. 12 (La.1/19/05), 892 So.2d 7, 15.
In this case, the WCJ determined that TEMBEC terminated benefits the day before Ms. Handy was told to report back to work and that the benefits were stopped because TEMBEC thought the modification to the winch had been made. Because the modification had not been made, the WCJ believed that TEMBEC was arbitrary and capricious in failing to reinstate benefits. We cannot say that the WCJ was clearly wrong in this determination and in awarding attorney’s fees in the amount of $7,000 to Ms. Handy.
CONCLUSION
After a thorough and complete review of the evidence presented in the record, we cannot say that the WCJ’s findings were manifestly erroneous or clearly wrong. Accordingly, we decline to disturb her ruling. The judgment of the workers’ compensation judge is affirmed. Costs of this appeal are assessed to the defendant, TEMBEC.
AFFIRMED.

. Ms. Handy's clavicle fracture never healed completely, resulting in a permanent clavicle nonunion.

. Ms. Handy was not represented by counsel at the time.

. At all pertinent times to this case, LSA-R.S. 23:1201.2 provided for attorney fees as follows:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims. The provisions of R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions of R.S. 22:658(C) shall be applicable to claims arising under this Chapter.
Although the statute was subsequently repealed by Acts 2003, No. 1204, § 2, LSA-R.S. 23:1201.2 is now incorporated in LSA-R.S. 23:1201.